Curia, per O’Neall, J.
A majority of this Court concur in the decision below.
The motion is dismissed.
Richardson, J.
The great pecuniary interest at stake, and the public concern in the decision of this case, call for a plain analysis of the fifth section oí the Act to incorporate the Bank of Charleston. The first section of the Act presents the foundation of the charter — and no unmeaning guide in expounding the terms, “ capital stock subscribed,” in the fifth section. The first section appoints commissioners to open subscriptions at named places. The Act then proceeds, “and the said commissioners” “ at each of the said places,” “ shall, (on given days,) open subscriptions for the purpose of raising two millions of dollars, whereof six weeks’ public notice shall be given in all the public gazettes of the State.” The commissioners are then directed to forward lists of the shares subscribed, to the commissioners named for Charleston, for the purpose of apportioning the shares, &c.
The Act then again proceeds as follows: “ And such said subscribers, paying their subscription moneys respectively; and all persons who may thereafter become stockholders in the said company, upon the payment of a bonus of two and one-half per cent, on every hundred dollars of the stock subscribed, be, and they are hereby incorporated.”
One is immediately struck with the following novelty and departure from the twenty-second section of the charter of the Commercial Bank of Columbia — that the subscribers, and all persons who may thereafter become stockholders, shall, upon paying the bonus of two and a half per cent., be incorporated.
*195 The corresponding section of the Commercial Bank is as follows: “ and such said subscribers, paying their subscription moneys respectively, and all persons who may thereafter become stockholders in the said company, shall be incorporated.”
In the fifth section of the Charleston Bank, the subscribers and “ the thereafter stockholders,” shall pay the bonus. And the reader inquires, why are two different classes of persons (the then subscribers and the thereafter stockholders) required to pay two and a half per cent.? Can it mean that every man, who shall at any time purchase stock, must pay two and a half per cent, upon every hundred dollars, &c.? This cannot be; and yet certainly the two and a half per cent, is required of two classes. The Act must then contemplate some particular class of future stockholders, who are to pay a bonus, as well as the original subscribers; and the per centum must be upon whatever sum may be raised. We pass to the fifth section, and we then see plainly who are the “ thereafter stockholders,” that are to pay also a bonus of two and a half per cent, on their own subscriptions. The first and the fifth sections are inseparable from each other; not only in this, but every point of view.
The fifth section is as follows: “ That at any time before the expiration of their charter, the said company may, by paying a bonus of two and a half per cent., and by advertising at the places and for the periods above mentioned, extend ' the amount of capital stock subscribed, to a further sum of two millions of dollars, to be paid in the same manner, and subject to the same condition, with that herein already provided for.” So far from being separated from the first section, seldom does any section of an Act refer back to preceding provisions, so explicitly as the fifth section does to the first, in this charter. “A bonus of two and a'half per cent.” is to be paid; but upon what? We must look back to the first section to complete the sense. “ On every hundred dollars of stock subscribed.” This is to be done by advertising. But how? Look to the first section, and you find, “for six weeks in all the public gazettes in the State.”
Again: the words, (of the fifth section) “at the places,” must be utterly rejected, as unmeaning, but that we bad *196 already known from the first section, that the advertisments were of the places where, as well as of the times when, the subscriptions shall be opened; and then we see plainly what “advertising at the places” meant. These words were, in the discussion, considered unintelligible, and I therefore quote the first section; “ and the commissioners, at each of the said places, &c., &c., shall open subscriptions,” whereof, “ six weeks notice, &c., shall be given,” &e. Now, I ask, notice of what? Why, of the times and places, surely. What then is meant “by advertising at the places, and for the times above mentioned,” is plainly, that the public notice shall be for six weeks, of the “ stock subscribed,” at the places named in the first section. And finally, if further proof be wanting of the close union between the different sections, “ the stock subscribed” in the fifth, is to be paid “in the manner and subject to the same conditions with that herein already provided for,” irresistibly refers to the manner and conditions set forth in the immediately preceding fourth section.
The fifth section, without reference to both the fourth and fifth sections, would be unintelligible.
I do not understand, in fact, that the construction of the fifth section is denied, except as to the words, “ at the places;” and yet the case is argued as if the first section, as well as the fourth, were not the essential exponants of that very construction. You cannot get at such construction, but through both the first and fourth sections. It is admitted, that before the company can extend the capital stock to two additional millions, they must advertise their intended subscription for the time required in the first section of the Act —must pay a bonus of two and a half per cent, upon the stock subscribed, as therein explained, and receive payments in the same manner, and upon the same conditions, as provided for in the original subscription of two .millions of dollars.
The company must again open subscription in order to answer the words, “stock subscribed:” but they insist that the right of subscribing to this additional capital, is restricted by the Act to actual stockholders, and unaccountably to my understanding, they reject altogether the words, “at the places,” which have a plain meaning. But the controversy *197 is narrowed down to the proper interpretation of the words, “ the company may,” &c. “ extend the amount of capital stock subscribed.”
The first and best rule for the interpretation of any Act of the Legislature, is, that we shall be governed by the words and terms of the Act itself, to be taken in their usual sense; but, inasmuch as the Act in question affords no words or terms which either expressly restrict the subscription to stockholders, or lay it open to the public, we are to have recourse to the second rule of interpretation; that is, to be governed .by the general object, obvious policy, and the spirit of the Act, which may limit or extend the words, “ stock subscribed,” in their meaning. The right claimed for the stockholders is .a peculiar privilege, commonly called a franchise ; and the stockholders must show an intelligible warrant for their peculiar claim, otherwise an information in the nature of a quo warranto, will be granted against them, for their usurpation of the assumed franchise, without satisfactory proof of title. Whether the stockholders have a right to this franchise depends upon the intention of the Legislature; and we are to answer the question of the case, as sound reasoning points out, would have been the answer of the Legislature, if the same question had been put to themselves at the moment of passing the Act; subsequent, circumstances can have no influence in such interpretation. But anything within the obvious intention at the time, is as much within the true interpretation as if it were written in the Act. And such a construction is always to be given, as not to suffer the plain intention to be eluded. We proceed then to interpret the intention of the important words, “the company may extend the amount of capital stock subscribed,” &c.; I should rather say, the important word “ subscribed,” in connection with the right of the company to extend the capital stock. Does the word “subscribed” mean a subscription restricted, to the stockholders ? The burthen lies upon those who assume the privilege, because it is in derogation of the right of the public, in common with the stockholders. It is a peculiar grant which estops the general right of subscribing. First, then, we will notice the meaning of the words “subscribed,” “ subscription,” and the like words, when used in other sections of the Act; and if they import a general sub *198 scription for all, endeavor to discover whether such original meaning is uniform, and extends to the fifth section, of the Act. No one can doubt that in the first section, the words “ subscription,” “subscribed,” &c., plainly import the general right of all the citizens to subscribe for the stock of the bank incorporated. It may be remarked here, that the first and fourth sections make no provision, in case of the subscription amounting to less than two millions of dollars, and accordingly the next section in sense and connection with the former, is the twenty-fifth — “that if the stock be not taken up, on the first Monday and Tuesday in June next, the books shall be opened in Charleston on the first Monday in October next, and kept open until the first Monday in November, unless the whole amount is taken or subscribed.”
The peculiarity of the twenty-fifth section is, that the books are to be re-opened only in Charleston. But here also we may. assume that the meaning is, that in the event noticed, the subscription is to be opened to the whole public, and that the word “subscribed,” at the end of the twenty-fifth section, indicates taken or subscribed by any person whatsoever. This section is so closely connected in its matter with the first and the fourth sections, that we cannot but hold it as a mere detail or adjunct, upon the same subject with them. The fourth section, I should remark, prescribes how the subscriptions are to be reduced, in case the money subscribed in June should overgo two millions of dollars. It prescribes, also, the times of payment, the forfeiture for non-payment, and so on. But suppose for a moment, what might have happened, that in June, 1835, only one million had been subscribed; who would have to open the subscription again in October ? I answer, assuredly the commissioners named by the first section, for Charleston. But suppose this second subscription in October had overgone the balance left of one million; how would it be reduced ? I answer again, assuredly under the term of the fourth section; because such an intention of the Act is reasonably drawn from the extent and the object in view — and therefore, may be considered a necessary part of the Act. But suppose the subscribers to the one million in June, had chosen to advance the bonus of two and a half per cent, upon the entire two millions, and seeing the avidity of *199 the public to subscribe, and a great appreciation of the scrip, and urging that by their means the value of the subscription in October bad been greatly raised since June, should claim the exclusive right to subscribe for the balance of one million in October ? The answer to such an assumption of an extraordinary right, would have been plainly this: there does not appear, from the positive terms of the Act nor from the necessary intention of its provisions and objects, that such an exclusive right is given to the first subscribers. True, it is, that the subscription was closed in June, and is again opened; the scrip and the value of the subscriptions have risen, and probably by your agency; and you have been good enough to pay a large bonus before it was due; but no rise or fall of the scrip, and no subsequent adventitious circumstance, and no act of yours, can alter the proper construction of the Act. The construction depends upon the intention expressed, or plainly implied, at the moment the Act passed, and not upon subsequent occurrences, which change with the times: no warrant for such an exclusive right appears from the letter of the Act, and none such is essential to its objects; the claim must therefore fail. Yet, it must be confessed, that the first subscribers in June must have their subscription money of twenty-five dollars per share lie idle longer than those who subscribed in October; and the books being re-opened at one place, and the words “taken” or “subscribed,” might give rise to such a notion. We have now taken two steps towards the true construction of the fifth section of the Act.
1st. That the words, “ to receive subscriptions,” used in the first section, and the words of the twenty-fifth section, “ the books shall be opened in October, and kept open,” &c., “unless the whole amount is previously taken or subscribed,” do mean that the subscription shall be open, and after public notice given to the whole public in both June and October likewise. Though I admit that an ingenious mind might fasten an argument for the first subscribers, on the twenty-fifth section, on the grounds before noticed; and- the more so, as the twenty-fifth section does not explicitly require public notice to be advertised; but any distinction in their favor, would strike my understanding as merely specious; because this section must be read in reference to the first and fourth sections, as parts of the same subject.
*200 2d. We have probably made it satisfactory, too, that no rise or fall in scrip or stock, no adventitious circumstance, and no merit or demerit in the conduct of the stockholders, or the expectations of speculators, or the public, can make any difference in the construction of the Act.
This last rule rids us of the force of many observations made, both for and against the exclusive right claimed for the stockholders. All such argument arises from the desire on the one side to partake in the second subscriptions; and the no less interested wish of the stockholders, to confine the right to themselves. It is a fair contest for money’s worth. But that can make no- difference in the import of the Act; again, then, the question recurs — what do the words of the fifth section mean? “The company may,” &c., &c., “extend the amount of capital stock subscribed.” It is evident that the word “subscribed,” means that some subscription shall be opened.. And why should it not be as general as the first? The terms and words being the same, circumstances which existed at the passing of the Act, may shed light on the meaning ; whether it is to be a close or open subscription. Before the charter of the Planters’ and Mechanics’ Bank, in 1812, the capital stocks of banks had been made up without a public subscription: since that time, a subscription has always been opened; but all extensions of the original stock have been allowed, without any subscription, with one exception to be noticed hereafter. The charter of the Commercial Bank of Columbia, passed 17th of December, 1881, has been the general model for the Bank of Charleston, as it had been that of the Camden, Cheraw, Hamburg and Georgetown Banks; and the twenty-second section of that charter has been reiterated by all those banks except the Bank of Charleston. The twenty-second section is in these words, (p. 28,) “ And the said corporation are hereby authorized to increase their capital to a sum not exceeding eight hundred thousand dollars. Should the, majority of the stockholders, at a general meeting, at any time during the continuance of their charter, deem the same necessary and advisable, by disposing of a number of additional shares, not exceeding twelve thousand; and for every hundred dollars so disposed of by the said corporation, the bank shall pay into the treasury the sum of two dollars.”
*201 By the uniform practice of all the banks concerned, the meaning of this twenty-second section has been construed to endow the stockholders with the right of extending their capital, by disposing of the additional shares to their own use, upon paying for them and the bonus required, without any subscription. This may be well considered as the settled and true construction of the section, and the argument drawn from comparison with it, is a fair one on both sides.
But the evident departure from the phraseology of that section, which is found in the fifth section of the Charleston Bank, especially when it requires that there must be a subscription of some kind at least; that the subscription shall be advertised for certain periods, throughout the whole State; and that the money shall be paid in the same manner and subject to the same conditions already provided in reference to the original public subscription — these changes introduce a rational answer; that the entire right of subscribing, as well as the manner of proceeding, may have been intended to be changed; and a public subscription opened, precisely as at the original subscription. Take for example one of the preliminaries to the extension of the stock by the fifth section, “ six weeks’ public notice is to be given,” in all the public gazettes in the State; wherefore .this very general notice ? And when we call to mind, that the extension of the capital amounts to the vast sum of two millions of dollars, who can say that it is clear that the Legislature meant this great benefaction to go to the original stockholders alone: and that they did not mean by “ capital stock subscribed,” a general subscription, like the first ? and that hence arose the necessity of notice to the whole State, &c. Is the exclusive right of the stockholders clear and well defined ? Is the conclusion in favor of them fairly drawn from the context, and plainly concurrent witb the objects of the Act? On the other band, is not the right of the public more plainly inferred from all those considerations?
I can perceive doubt and uncertainty in the construction which would limit the import of the words “capital subscribed,” to a subscription for the stockholders exclusively. But for the condition attached to the twenty-second section of the Commercial Bank, and the practical construction of its' *202 phraseology, which is correct to the letter, one would, conclude that “ subscribed,” in the fifth section, is used as the same word is used in the first, fourth and twenty-fifth sections. The stockholders must show their warrant, either from the letter or the clear intention of the Act, or the public come in equally. But now, to reason strictly from analogy to the twenty-second section. The entire departure of the fifth section from the corresponding twenty-second section of the charter of the Commonwealth Bank; the notice required for six weeks, “in all the gazettes of the State;” the manner, conditions and times of payment being prescribed by an evident reference to the notice, conditions and times of payment prescribed for the original subscriptions in June and October; all seem to indicate an entire change from the purpose of the Commercial Bank, that the writer of the charter of the Bank of Charleston had in his head but one scheme of subscription, which being clearly defined in the former sections, is simply referred to as their substratum by the fifth as well as the twenty-fifth section, which are both so laconic as to require a connection with the foregoing series of regulations.
It may be remarked, too, that the reference to the terms of the first and fourth, by the language of the fifth section, is much plainer than that of the twenty-fifth section.
The public notice, the manner of paying, and the new stock itself, is expressly made subject to the same conditions as to the original subscription. One of the most important of these conditions, is a forfeiture of the shares and the money already paid, for any failure in paying on the day prescribed. "Why impose any forfeiture at all if the new stock is to be only in the hands of the former stockholders, who have already in the bank an amount of old stock equal to their new subscriptions, which must, of course, counter-secure and guarantee the corporation ? Why this severe forfeiture against a stockholder, for mere want of punctuality, where he has in the bank itself an amount of capital more than equal to his whole new subscription ? A, has in his cashier’s hands one hundred dollars; but he owes his cashier one hundred dollars, to be paid by four instalments, under penalty of forfeiting what he has before paid, say seventy-five dollars, unless he pays punctually the last instalment of twenty-five dollars. A omits to *203 pass to bis creditor this specific twenty-five dollars. Would it not be a strange penalty to require A to forfeit seventy-five dollars, already paid, for not paying twenty-five dollars to one wbo bas in bis bands one hundred dollars of A’s money.
It is true, that the Legislature may have chosen in this instance to intermeddle with what, in all former charters, was left to the regulation of the company themselves. But upon a question of intention, does not such an inconsistency render it probable, that the Legislature, when they made such regulations were thinking of the public at large — and never thought they were meddling only with the money rights of certain stockholders ? "Why this singular intermeddling of the Legislature in this solitary instance ?
Look through all the other charters of banks, and through the Acts to extend bank capital, and we find not one regulation required by the Act of any other bank, when they are to extend their capital. No advertising, or manner of payment, or forfeiture, or condition whatever, but simply upon paying the additional bonus, the banks extend their capital to the given amount. On this point I have already presented the twenty-second section of the Commercial Bank, and the very same section belongs to the Camden, Cheraw, Georgetown, and Hamburg Banks; and for a further instance, I extract the corresponding section from the Act of 1832, p. 65, to renew the charter of the Bank of South Carolina, &c., “it shall and may be lawful to and for the said Bank of South Carolina, at any time after passing this Act, to extend its capital to any amount not exceeding one million of dollars” — the said bank paying an additional bonus in proportion to such increase of capital.” No condition, manner, form, time, or notice whatever is laid down; and the reason is plain. When the extension of the capital is for the stockholders alone, no regulation is necessary; the public are concerned about the bonus alone; but when the additional capital is to be subscribed for the public, then notice, time, manner of paying, and forfeiture, become indispensable: the new stock is then as a new bank to be engrafted on the old bank, after the subscription and bonus are first paid. In the history of the “Bank of the State of South Carolina,” we have a pe2’fect illustration; look at the Act of 1826, p. 21, to admit and incorporate pri- *204 yate stockholders in the Bank of the State of South Carolina; and you see an explicit instance of what I have just said. The Act was to extend the capital by subscription, and accordingly we find in substance, the very same conditions, manner, place, and forfeiture for default of payments, as are laid down for the extension of the capital of the Bank of Charleston. - And all these are in addition to the bonus, precisely as required in the fifth section of the Bank of Charleston, and the new subscribers then become stockholders, and are incorporated.' It is not necessary to suppose that the writer of the present charter read over the Act alluded to— common sense suggests to any practical man the same or similar regulations, where the additional capital is for the public, and not for a few individual stockholders; such regulations when so made, and annexed to the subscription required by the fifth section, furnish strong argument upon the intention of the Legislature ; and it does not remain for a Judge to say for the first time, that the intention, when drawn from the context of the Act, and concurs with its object, and is not against its letter, is as much within the Act, as if it was so written. In the present instance the bonus itself is to be paid to the State only by reasonable intendment, for the Act does not state in terms to whom it is to be paid. Take then the progress and practice of our banks, and the corresponding sections of the charters — apply and compare them with the fifth section of the Bank of Charleston: and is there not such reasons drawn, both from the intrinsic regulations of the fifth section itself, and also from the corresponding provisions for the extension of bank capital in general, to say, that when the Legislature departed from the twenty-second section of the Commercial Bank, also from all similar sections in all private banks of the State, that it did so depart purposely, and simply because the right of public subscription required such departure from them, and the customary regulations of notice, time, place, manner, conditions, and forfeiture ? If an example be required for this view of the case, we have it in the Act to admit and incorporate, through the means of a subscription, new subscribers to the Bank of the State of South Carolina. Upon the same conditions can we then be safe, in concluding that the subscription plainly required by the fifth section, means no more than that through the form of a subscription, *205 a franchise and mere boon is given to the corporation of the Bank of Charleston ? Are we all at once to depart from the meaning of the word “ subscribed,” as certainly used in the fourth-and fifth sections of the present charter, and narrow it down in the fifth section as if it had been capriciously used ? This is strong language, but I must say that after full consider ation of the whole subject, and after thereby relieving my understanding of the weight of respect due to and felt for the very respectable names annexed to the opposite opinion ; and being thus left entirely to my own convictions, that neither from the letter of the fifth section, the body and spirit of the whole Act, the consequences which arise, from the history and comparison with similar provisions, can I admit that opinion to be fairly deducible from or concurrent with the charter of the Bank of Charleston, On the contrary, and although there is by no means a mathematical demonstration, yet a rational and moral conclusion is drawn from the same source which estop that opinion, and proves, at least, that the stockholders cannot exhibit any warrant for the franchise claimed, and that of course the quo warranto must be allowed in favor of the general public right. Some inconsistency with this construction has been suggested upon the supposition, that the bonus of two and a half per cent, must be paid before the subscription is opened. But this is gratuitous surely— the bonus of two and a half per cent, is upon the amount that may be subscribed, not for the right of opening a subscription. The sum total of the bonus depends upon the amount of the subscription, not upon the right merely to open the books.
Turn again to the first section, “ and such said subscribers paying their subscription money respectively, and all persons who may thereafter become stockholders in the said' company, shall, upon the payment of a bonus of two and a half per cent, on every hundred dollars of the stock so. subscribed, be, and are hereby incorporated.”
Apply the terms to the stockholders for the extended stock —and can there be any more difficulty now than there was at the subscription ?
Is it not visible to ordinary conception, that two classes of stockholders, (those to the first, and those to the second sub *206 scription) were in the mind of the writer ? It may not be very skilfully drawn, but it plainly and literally means as follows: “ And such said subscribers (meaning those to the first subscriptions,) paying their subscription money respectively, and also persons who may thereafter, (when ? why after the first subscription,) become stockholders, shall, (who shall ? both classes clearly,) upon the payment of a bonus of two and half per cent, be incorporated,” &c. Both classes are incorporated upon the payment, by each, of two and a half per cent, and of course, upon the stock respectively subscribed by each. The advocates of a restricted subscription may reply, that this first section is copied from that of the Commercial Bank; and so it is, save and except in the important particular immediately subjoined to “ the thereafter stockholders, shall, upon the payment of two and a half per cent, be incorporatedand this is found in no other of the many adoptions of the twenty-second section of the Commercial Bank — and need I say, that when one departs from bis pattern in one particular, it means something different; and the departure herein is concurrent with my construction of the manner of paying the second bonus. The plain reason why the bonus is here brought in so differently from that of the Commercial Bank, is, that bonus in this instance consists in a per centum upon the first subscription, and upon the second also — supposing there may be yet, and in like manner, a bonus upon a third and fourth subscription: who can say what the aggregate of the bonus will be, before the subscription is made? It may amount to only half a million, and then the bonus will be but twelve thousand five hundred dollars.
The company may to-morrow, limit the amount to any sum, and that sum may not be all subscribed, but the money actually subscribed, will according to its amount, extend the capital so much, and for aught we know, all the subscriptions may never amount to the ultimate limit of two millions; but this does not interfere with the right to extend the capital stock subscribed as far as the company can, within two millions —and at any time before the expiration of their charter.
I cannot realize any difficulty, how the bonus of two and a half per cent, is to be paid. We have only to read the charter as we do any other connected treatise, on a given *207 subject: connect the different parts by their sense and topics, and refer the'language to the subject matter, and we see both sóbeme and principles. For example, do but read in the legitimate and rational way, (I say it with great deference to others,) the first section, which defines the bonus as a per centum upon the amount subscribed; then come the fifth section, close in sense and connection with the first, “ and the said company may, by paying a bonus pf two and a half per cent,” &c., &c.
The difficulty is, to expound why the corporate company must pay this second bonus. Why, who else is to pay it? The company is to order the extension of the capital subscribed at any time; the company is to advertise the subscription and receive the money subscribed; who else then but the company, is to pay over the two and a half per cent, bonus upon the amount subscribed ? The company are the trustees of the new subscribers, until the bonus is paid: and then the old and the new compose the corporation ; but the two and half per cent, is taken out of this second subscription money, just as the first bonus was taken out of the former' subscription money; and upon the payment of their second bonus, the new subscribers become stockholders, subject to the same conditions that bad before related to the first subscribers; there is no difficulty. You simply follow the first model, and possibly it may not be unworthy of the trustees of such a power, to weigh well their high trust in this particular.
It is not a selfish subject. It is purposely made, and in its nature is a noble public trust, in which the stockholders participate in a common interest: and I will still hope it may inure to its proper end.
I regret the tiresome length of this paper: but one other difficulty should be answered. It is asked, who are now the named commissioners to open the books of subscription ?
The answer is — in all offices, or public posts, the governor fills vancancies. There is no more difficulty now, than there have been in June or October, 1835, at the original subscription. It is, perhaps, best that the governor should name, and the company sanction the appointment; yet it does not strike my mind but that the company may open subscriptions themselves. They are made the trustees and agents for the public in all respects, following their charter for their com *208 mission. But they are to fulfil the end, and not destroy, because a gratuitous public burthen is annexed to their privileges of a great bank. It is a trifling burthen compared with what was put upon the late Bank of the United States, and properly considered, is a badge of high legislative confidence ; and I do venture the supposition, that if the Bank of the United States bad in the very words of the fifth section of the Charleston Bank, the authority to double its capital stock subscribed, it would not have stood a question, that the entire “ United States” were equally interested in the subscription ; that there being no express change in the right, the general public right ought not to be cut down. Again, it is asked, are the new stockholders to come in to bold in common the property of the company? Assuredly. The present company take them as they take the purchasers of stock; and new subscribers may join a failing or prosperous concern, at their own risk: both parties know, that in general, the more stocks you place along side of each other, the stronger the common union, and they take their chance for better or for worse. Was there any difliculty on this subject in the Railroad Company? The new subscribers becomes corporators, and the common right of property follows. There is no difficulty. But having now treated of the whole discussion, as was felt a' duty, I have to regret more, that I could not see with the judicial sagacity of my brethren, than that they do not feel the force of my construction of the letter and the true object of the Charleston Bank charter.